ANTHONY CANZANO and MARY CANZANO, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Canzano v. Commissioner
Docket No. 6718-77.
United States Tax Court
T.C. Memo 1983-320; 1983 Tax Ct. Memo LEXIS 475; 46 T.C.M. (CCH) 368; T.C.M. (RIA) 83320; June 6, 1983. *476 Sherman F. Levey and Carol S. Mullin, for the petitioners. Ruth E. Salek, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1969
$74,732.75
$37,366.37
1970
4,872.89
2,436.44
Since the issuance of the notice of deficiency, respondent conceded that petitioner Mary Canzano is an innocent spouse under section 6013(e) with respect to petitioners' 1969 taxable year, and that petitioners are not liable for the deficiency or addition to tax for 1970. In the absence of fraud, the statute of limitations bars respondent from assessment and collection of any deficiency with respect to petitioner Anthony Canzano for 1969. Thus, the principal issue for decision is whether petitioner Anthony Canzano filed a false and fraudulent Federal income tax return with intent to evade tax for 1969, or willfully attempted to defeat or evade tax for such year. FINDINGS OF *477 FACT Some of the facts have been stipulated and are found accordingly. Petitioners resided in Rochester, New York, when they filed their petition herein. During 1969, Anthony Canzano (hereinafter petitioner) and Mary Canzano were husband and wife, and they timely filed a joint Federal income tax return with the Internal Revenue Service Center, Andover, Massachusetts, for such year. Petitioner is approximately 59 years of age and has been involved in various business and investment activities since he left high school during 1939. [2] Between 1939 and 1946, petitioner worked for a box and lumber company and he also delivered meat for a market located in Rochester. During 1946, petitioner entered the used car business, which he has continuously carried on through 1969. At some time between 1960 and 1970, petitioner and his brother Daniel Canzano invested in certain real estate properties, which included a gas station and a funeral home in Rochester. During the latter part of 1967, but prior to November of such year, petitioner, Michael Amico (hereinafter M. Amico), Angelo Amico (hereinafter A. Amico), *478 and Oskie DiMarco (hereinafter DiMarco) explored the feasibility of carrying on a travel business whereby they would arrange gambling trips or "junkets" to Las Vegas for individuals in the Rochester and Buffalo vicinities. They became more encouraged about the idea after speaking with individuals who were associated with a few casinos in Las Vegas. On or about November 22, 1967, petitioner, M. Amico, A. Amico, and DiMarco organized the MATO Flyers Club, Inc. (hereinafter MFC) to arrange gambling trips to Las Vegas. All four individuals initially owned 25 percent of MFC's outstanding stock and served as officers of the corporation. [3] MFC rented office space in Rochester and the corporation employed a secretary. During 1968, MFC began organizing junkets to Las Vegas. [4] Many individuals learned of MFC's junkets by word of mouth, and those individuals who paid the company a nominal "club" membership fee received brochures from MFC which notified them of upcoming junkets. During September 1968, MFC hired *479 Stevie Jo Rice (hereinafter Rice) as the company's secretary and receptionist, replacing their previously hired secretary who had left the company. By the end of 1968, petitioner was the only one of MFC's four organizers who was active in the company's daily operations. During 1969, MFC organized seven junkets to Las Vegas, two of which were at the Flamingo Hotel and five of which were at the International Hotel. Each of these junkets lasted approximately four days. Both the Flamingo and International hotels were under the same management during 1969. Individuals who went on these junkets were provided free roundtrip airfare, as well as complimentary hotel rooms and meals. In exchange for the free trip, the cost of which was absorbed by the hotel, the guests were expected to gamble at the hotel's casino. Generally, individuals who went on any of MFC's Las Vegas junkets were required to put up "front money" to cover any potential gambling losses that they might incur. Each individual who went on MFC's junkets had *480 to provide approximately $2,500 in front money, which petitioner generally collected at the airport before allowing that individual to board the airplane. [5] Petitioner would turn the front money over to the hotel when the junket arrived at the hotel. During the course of a junket, it was common for individuals to incur gambling losses in the amount of their front money prior to the end of their trip. Such individuals would often ask the hotel to extend credit to them so that they could continue to gamble. Each individual to whom credit was extended was required to sign a "marker" representing the amount of money that he was loaned by the hotel. A marker was equivalent to an IOU and was collectible by MFC within thirty after the individual returned home from Las Vegas. If an individual did not satisfy his outstanding markers within thirty days then MFC would contact him regarding payment. All money collected for *481 outstanding markers was carried to Las Vegas on the next MFC junket, provided that the next trip was scheduled to occur within approximately thirty days of collection; otherwise MFC would generally send the hotel a cashier's check along with a list of the names of individuals from whom market money was collected and the amounts collected therefrom. MFC earned commissions from the Flamingo and International for each junket it arranged to those hotels. The amount of MFC's commission was set at either $3,000, $3,500, or $5,000 depending upon the number of people on the particular junket and the commission schedule then in effect. During 1969, MFC earned a total of approximately $23,500 in commissions from the aforementioned hotels, but it did not receive payment of those commissions during that year. MFC paid petitioner a salary of $100 per week during 1969. At some time during the first few months of 1969, DiMarco and A. Amico brought Salvatore "Sammy" Gingello (hereinafter Gingello) into MFC's office to meet with petitioner. Petitioner had first met Gingello on a previous junket run by MFC. Gingello informed petitioner that he wanted to be employed by MFC because he knew a *482 lot of gamblers in the east side of Rochester who would be interested in going on junkets to Las Vegas. Petitioner, on behalf of MFC, employed Gingello at a salary of $200 per week. In addition to finding individuals who wanted to go on junkets, Gingello was also responsible for assisting in the collection of market money. Throughout 1969, Gingello referred a substantial amount of business to MFC. Prior to Gingello's involvement with MFC, the company enjoyed a fine business reputation with the Flamingo and International hotels; its collection and remittance of funds from outstanding markers had been prompt and both hotels were very satisfied with the company's operations. After Gingello became associated with MFC, however, petitioner became concerned with the operation of MFC's business because, in an increasing number of cases, the individuals which Gingello had referred to MFC were not paying their outstanding markers.Petitioner expressed this concern to John Burton Oakes (hereinafter Oakes), the credit manager of the International Hotel. Petitioner requested from Oakes that the International refrain from extending any further credit to individuals who were referred to MFC *483 by Gingello, until such individuals made payment on their outstanding markers. Individuals who had outstanding markers would make payment on them in the form of cash to either petitioner, Gingello, or Rice, depending upon who was in MFC's office at the time, or who visited a particular individual in order to collect the marker money. Cash that MFC had collected was stored in a safe deposit box at the First National Bank (hereinafter FNB) in Rochester and both petitioner and Gingello had access to such box. Both the Flamingo and International hotels were aware that MFC used a safe deposit box to store marker money which the company had collected. MFC also had a safe deposit box at the International Hotel to store the gambling winnings of its customers. On or about December 5, 1969, petitioner and Gingello went to the FNB and withdrew approximately $80,000 in cash from MFC's safe deposit box. Petitioner and Gingello had discussed making this withdrawal because MFC had a junket scheduled for December 10, 1969, and they wanted to bring the marker money to Las Vegas. Typically, petitioner would carry the marker money to Las Vegas, but Gingello told petitioner that he (Gingello) *484 would bring the marker money to Las Vegas. Petitioner agreed to let Gingello take the marker money home and bring it to Las Vegas. Gingello stored the marker money withdrawn from the safe deposit box, as well as some other market money which Gingello had collected, in a suitcase in his home. During the evening of December 6, 1969, Gingello's home was allegedly [6] broken into and the marker money which Gingello had stored in the suitcase was stolen. Petitioner did not learn of the alleged burglary until late in the afternoon the following day when Rice informed him that Gingello's house was burglarized. Petitioner tried unsuccessfully to contact Gingello, and then he called Oakes at the International hotel in Las Vegas. Petitioner informed Oakes that he didn't know all of the details, but that there had been a "robbery" at Gingello's house. After conveying that message to Oakes, an officer from the Monroe County Sheriff's Department came down to MFC's office and asked petitioner some questions. Petitioner cooperated with the officer. *485 On December 10, 1969, petitioner accompanied an MFC junket to the International Hotel, and he had an opportunity to further discuss with Oakes and other International Hotel officials the apparent theft of marker money from Gingello's house. When the junket returned from Las Vegas, petitioner had an opportunity to talk with Gingello who informed petitioner that approximately $120,000 in marker money was in the suitcase which was "stolen" from his house. Based on his memory, petitioner reviewed with Oakes the names of individuals who had been on MFC junkets and whether or not marker money had been collected from them. [7] In addition, petitioner flew back to Las Vegas and brought with him copies of markers which were ket in MFC's office. One of Oakes's concerns about the alleged theft of the marker money was that individuals who had not yet paid their marker money would, upon learning about the theft, claim that they had made payment on their markers. As a result of the alleged theft of marker money from Gingello's home, the International *486 Hotel asserted a claim of loss against its bonding organization in the amount of $81,000. Neither the International Hotel nor its bonding company has asserted a claim against petitioner for the appropriation of any marker money and neither company has ever claimed that petitioner received or misappropriated any funds belonging to the International Hotel. [8] Oakes, who was petitioner's main contact at the International Hotel and who reviewed the details concerning the alleged theft with petitioner, never found any reason to doubt petitioner's honesty. After the alleged theft of money from Gingello's home, Gingello was no longer employed by MFC as petitioner did not want to work with him. Nevertheless, Gingello, at the end of December 1969, told petitioner that he wanted a $10,000 bonus based on his prior performance as an employee. Gingello walked petitioner over to a bank and petitioner wrote out a check to Gingello in the amount of $9,600. Petitioner believed that his life would be in great danger if he refused to give Gingello *487 a bonus. [9] Ever since Gingello had been employed by MFC, Rice, the company's secretary, was under the impression that Gingello had become the boss of MFC; she had noticed a tension developing between Gingello and petitioner during 1969. During 1969, petitioner and his wife sold their home (hereinafter referred to as petitioner's first home) and some furnishings therein for approximately $16,000 and $3,000, respectively. Using those proceeds, a $12,000 loan from petitioner's father, and $9,000 in other funds, petitioner and his wife purchased another home (hereinafter referred to as petitioner's second home) for $40,000. The title to petitioner's first home was in his wife's name, and the title to petitioner's second home *488 was placed in the name of his married daughter.Finally during 1969, petitioner also purchased approximately $11,000 worth of stock in the International Leisure Company and he incurred a loan from the Marine Midland Trust Company in an amount at least equal to the purchase price of such stock. [10]
On or about April 15, 1970, petitioners filed their 1969 joint Federal income tax return, and they reported thereon income from wages, dividends, interest, and other sources in the amount of $8,037.87. [11] After taking into account various deductions and three personal exemptions, petitioners reported their taxable income, tax withheld on their wages, and their tax liability to be $4,713.30, $873.44, and $831.08, respectively.
*489 On December 19, 1973, petitioner, accompanied by his attorney, Sherman F. Levey, met with Richard Endler (hereinafter Endler) who was then employed as an attorney by the United States Department of Justice in its Organized Crime and Racketeering Section in Buffalo, New York, also known as the Buffalo strike force. Two special agents from the Internal Revenue Service (IRS), Charles Martin and John O'Connor, were also present at the December 19, 1973, meeting (hereinafter sometimes referred to as the December meeting). Approximately one and one-half months prior to this meeting, the Buffalo strike force had instituted Federal grand jury proceedings in order to investigate organized crime in the western part of New York state. One of Endler's purposes for the December meeting was to attempt to get petitioner to cooperate with the government in an investigation of Gingello and other alleged members of organized crime in the Rochester area. At the December meeting, Endler informed petitioner of his "Miranda" rights. Endler than stated that after investigating petitioner and MFC's operations, he (Endler) was in a position to recommend to his superiors at the Department of Justice *490 that criminal charges be brought against petitioner for mail fraud and tax evasion. Endler, however, did inform petitioner and Levey that, if petitioner cooperated with the Department of Justice in their investigation of Gingello and organized crime in the Rochester area, he (Endler) would recommend that no mail fraud, or tax evasion charges be brought against petitioner. Endler advised petitioner that his recommendation with respect to the mail fraud charge would carry more weight than his recommendation concerning the tax evasion charge, but in any event, he told petitioner that he had absolutely no control over any civil tax liability that petitioner might owe to the government. Endler warned petitioner that he was well aware of who Gingello was and that petitioner could be placing his life in jeopardy by cooperating with the government in its investigation of Gingello. Levey asked Endler to elaborate on the mail fraud allegation and Endler responded that he believed that MFC had collected [12] $250,000 in marker money that was owed to the International Hotel, and that petitioner pocketed at least some portion of that amount. Levey then expressed surprise with Endler's claim *491 that the International had allegedly lost as much as $250,000 as a result of failing to receive marker money from MFC's customers. Petitioner then attempted to orally account for the amount of marker money that Endler stated had been collected by MFC on behalf of the International Hotel but not transmitted to it. During the course of such accounting, petitioner stated that he "got $50,000," and that he used about $23,500 of collected marker money for the operation of MFC's Rochester office. Petitioner informed Endler that he did not feel that he could offer any testimony to the Department of Justice against Gingello. On August 29, 1974, the United States Grand Jury for the Western District of New York, sitting in Buffalo, returned a six count indictment charging petitioner with income tax evasion for the taxable year 1969 in violation of section 7201 and five counts *492 of mail fraud in violation of 18 U.S.C. section 1341. The counts in the indictment which pertained to mail fraud alleged that petitioner, during 1969, had various MFC customers mail him checks to cover their gambling losses at the International even though petitioner knew at such time that he "would not send and otherwise forward any such check[s] or proceeds to the International Hotel, but would fraudulently convert the said funds for his own use * * *." The single tax evasion count in the indictment alleged that petitioner willfully and knowingly attempted to evade and defeat a large part of his 1969 income tax by filing a Federal income tax return for such year whereon he reported that he and his wife had taxable income in the amount of $4,713.30, even though petitioner knew at the time of filing that he and his wife had joint taxable income of approximately $115,327.30 during 1969. On July 26, 1976, petitioner's criminal trial [13] for the aforementioned alleged violations began in the United States District Court for the Western District of New York (hereinafter referred to as the district court). On August 5, 1976, the district court judge presiding *493 at petitioner's criminal trial dismissed the five mail fraud charges and, on August 6, 1976, the jury found petitioner not guilty of income tax evasion for the 1969 taxable year. By notice of deficiency dated May 28, 1977, respondent determined that petitioner understated his taxable income on his 1969 Federal income tax return by $132,657. [14] Respondent further determined that all or part of the underpayment of tax required to be shown on petitioner's 1969 return was due to fraud. ULTIMATE FINDING OF FACT Petitioner did not file a false or fraudulent return with the intent to evade tax for 1969. Petitioner did not willfully attempt in any manner to defeat or evade tax for 1969. OPINION We must determine whether petitioner is liable for the deficiency and fraud addition to tax determined by respondent for 1969.Since the notice of deficiency in the instant case was issued more than 6 years after petitioner filed his 1969 Federal income tax return, *494 respondent is barred from assessing any tax for such year, absent a showing of fraud. Sec. 6501(a) and (c). Specifically, respondent, in order to avoid being barred by the statute of limitations, must establish that petitioner's 1969 return was false or fraudulent with the intent to evade tax or that petitioner willfully attempted to defeat or evade tax for such year. Sec. 6501(c)(1) and (2). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978). Respondent has the burden of proving fraud for each year that it is alleged by clear and convincing evidence. Sec. 7454(a), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner,276 F.2d 122, 128 (5th Cir. 1960); Beaver v. Commissioner,55 T.C. 85, 92 (1970). The taxpayer must be shown to have acted with the specific *495 intent to evade a tax believed to be owing. Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941); Estate of Temple v. Commissioner,67 T.C. 143, 159 (1976). Since direct evidence of fraud is seldom available, respondents may meet his burden of proof through circumstantial evidence. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). A taxpayer's failure to satisfy his burden of proof as to the deficiency determined by respondent does not, however, constitute proof of fraud. George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Respondent argues that the record provides ample support that petitioner filed a fraudulent return with the intent to evade tax and that petitioner willfully attempted to defeat or evade tax for 1969 within the meaning of section 6501(c)(1) and (2). Respondent maintains that petitioner "collected and kept for himself" $132,657 in marker money which MFG had collected and did not forward to the International Hotel in Las Vegas. Since petitioner did not report that marker money on his 1969 return, respondent *496 argues that petitioner underpaid his taxes for such year and that the underpayment was due to fraud. Petitioner, on the other hand, contends that the record does not even establish that he understated his income for 1969. For the reasons set forth below, we hold for petitioner. If respondent's embezzlement claim is supported by the record, the embezzled proceeds would clearly constitute taxable income, and petitioner's omission of such income on his 1969 return would be significant evidence of fraud. James v. United States,366 U.S. 213 (1961); Harber v. Commissioner,249 F. 2d 143 (6th Cir. 1957), affg. a Memorandum Opinion of this Court. In support of his determination, respondent maintains that several indicia of fraud are present in the instant case. Respondent points to these indicia of fraud as circumstantial evidence that petitioner made an underpayment of taxes for 1969, and intended to evade taxes for such year within the meaning of section 6501(c)(1) and (2). First, respondent contends that petitioner confessed to Endler at the December 1973 meeting that he "personally pocketed" [15] $50,000 of marker money that was due the International *497 Hotel. Respondent reaches this conclusion based upon petitioner's statement at such meeting that he "got $50,000." According to respondent, we should conclude that petitioner underreported his income for 1969 by at least $50,000. After carefully examining the record herein, we conclude, for the following reasons, that the record does not contain clear and convincing evidence that petitioner's remark that he "got $50,000" was a confession that he personally pocketed such amount. [16]
To begin with, the context in which petitioner made such remark was not *498 indicative of a confession. Petitioner stated that "he got $50,000" immediately after Levey had expressed surprise at Endler's comment that the International Hotel had lost approximately $250,000 as a result of failing to receive marker money for which MFC had the responsibility of collecting. By stating that he "got $50,000," we think that petitioner was simply reacting to Levey's surprise and trying to determine whether the International could very well have lost approximately $250,000. A natural starting place for petitioner in making such a determination would be by figuring out how much marker money he had personally collected. In other words, petitioner's comment that he "got $50,000" was likely nothing more than a statement that he had collected $50,000; not a confession that he personally pocketed such amount. [17]
*499 Second, there is no clear indication in the record that either petitioner or his attorney Levey, knew in advance of the December meeting that petitioner would be accused by Endler of mail fraud and tax evasion. At best, the most the record indicates is that prior to the December meeting, petitioner and Levey may have been aware that Endler was seeking to enlist petitioner's cooperation in testifying against Gingello. [18] Given such knowledge prior to the meeting, respondent's claim that petitioner confessed at the meeting to appropriating marker money strains our better judgment. We do not think that petitioner, who had his attorney present with him at the December meeting, would confess to a crime using such ambiguous language and prior to privately discussing the consequences of such a confession with his attorney. In this connection, we add that petitioner testified that he used the phrase "got $50,000" to mean that he had collected $50,000; not that he had personally appropriated such amount. We found petitioner to be a forthright and credible witness, and we believe that his testimony, in light of the entire record, provides a much more believable account as to the significance *500 of his remark at the December meeting. *501 Third, Endler testified that he did not make written notes of the December meeting until approximately two and one-half years after such meeting. Endler further testified that he thought that petitioner was confessing to appropriating marker money when he stated that he "got $50,000." Since Endler waited such a long time to memorialize what had transpired at the December meeting, and since the record is unclear as to the extent which petitioner relied on those notes in giving his testimony in the instant case, we are reluctant to place great weight on Endler's interpretation of petitioner's remarks. On the record before us, we do not find petitioner's remark to be clear and convincing evidence that petitioner underreported his income for 1969 by $50,000 and, thus, underpaid his tax for such year. Aside from petitioner's statement at the December meeting, respondent has cited six factors in support of his claim that he has met his burden of proving fraud by clear and convincing evidence. We will now address these six indicia of fraud. Respondent argues that petitioner dealt extensively in currency, both in his personal life and in the operation of MFC, and that such dealing *502 is indicative of concealment of income. See Scheurmann v. United States,174 F. 2d 397, 398 (8th Cir. 1949), cert. denied 338 U.S. 831 (1949). With respect to petitioner's business life, respondent points out that petitioner chose to keep large amounts of cash in a safe deposit box at the bank rather than deposit such amounts in a bank account. While we think that petitioner's use of the safe deposit box justifiably gives rise to some initial suspicions, we are not persuaded that petitioner used the safe deposit box, as respondent argues on brief, as a means of avoiding records of the amounts he had collected in his business. With respect to petitioner's use of cash for personal items, respondent claims that petitioner must have dealt extensively in cash. Petitioner was known to drive expensive cars and visit night spots (i.e., clubs). In addition, respondent claims that petitioner purchased an in-ground pool for $8,000, and he points to the fact that petitioner received $3,000 in cash during the sale of his first home which did not appear on the closing statement. Respondent's proof as to petitioner's nightclub activities, expensive automobiles, *503 and in-ground pool consisted solely of very brief testimony from an IRS agent which was too incomplete and conclusory in nature to substantiate respondent's excessive dealing in cash theory. [19] If we were to give great weight to an IRS agent's testimony that petitioner has been "known to visit the night spots" and is "a big spender" then we would be ignoring the fact that the government must prove fraud by clear and convincing evidence, not by conclusory statements. As regards the $3,000 in cash which did not appear on the closing statement for the sale of petitioner's first home, petitioner testified that the $3,000 was not for the sale of his home, but for the sale of some personal possessions, including a lawnmower, refrigerator, stove, and some miscellaneous furnishings. This testimony was credible and entirely unrebutted by respondent. Petitioner's testimony indicates that he viewed the sale of his first home as separate from the sale of his possessions. Thus, we do not find the fact that the sale of $3,000 of personal possessions was omitted from the closing statement to be unusual *504 or to demonstrate that petitioner was attempting to conceal his income. [20]
As a third indicium of fraudulent intent, respondent points to the fact that petitioner concealed his assets by placing his first home in the name of his wife *505 and his second home in the name of his daughter. We cannot impute a fraudulent intent solely on the fact that one spouse purchases a home in the name of the other spouse. As for placing ownership of his second home in the name of his daughter, we also think that such an action is inconclusive evidence of fraud. Respondent maintains that a fourth indicium of fraud in the instant case is petitioner's concealment from the International Hotel of collections made by him. Respondent contends that such concealment creates an inference that petitioner would also attempt to conceal his receipt of those proceeds from the government. We disagree, however, with respondent's claim that petitioner intended to and did conceal his collections from the International.The record herein shows to our complete satisfaction that petitioner cooperated fully with the International in reporting to such hotel the collections made by MFC. Prior to the alleged theft of marker money from Gingello's home, the record supports a conclusion that the Flamingo and International hotels were very satisfied with MFC's collection record and operation. After the alleged theft, the record is replete with evidence *506 that petitioner cooperated fully with Oakes, the credit manager of the International Hotel, supplying him with the names of those individuals who had not paid their markers.In this connection, we think that it is significant to note that the International Hotel has never made any claim against petitioner for appropriation of marker money. Oakes, who dealt with petitioner throughout 1969, testified favorably at petitioner's criminal trial as to petitioner's honesty. Thus, we do not conclude, as respondent suggests, that petitioner's operation of MFC is evidence that he concealed income and underpaid his taxes for 1969. As two other indicia of fraud, respondent claims that petitioner failed to keep or furnish adequate books and records, and that he made some inaccurate statements during the investigation of his case and at trial. As to respondent's claim that petitioner failed to keep or furnish adequate books and records, such conduct is not necessarily indicative of fraud; instead it could be indicative of negligence. While the record does not contain detailed records of all of petitioner's financial transactions, we are unable to find, after carefully reviewing the record herein, *507 that the lack of some of those records is because petitioner had a fraudulent intent to evade taxes.Moreover, to the extent that petitioner maintained books and records, we find totally unsubstantiated respondent's claim that petitioner failed to furnish them to the IRS, or that petitioner intended to mislead either the IRS or this Court in the determination of his 1969 tax liability. In fact, the record reveals that petitioner was cooperative with the IRS during its investigation of him. One of respondent's witnesses, an IRS agent, testified that petitioner met and talked freely with IRS agents on approximately nine different occasions; on approximately seven of those occasions petitioner did not have his attorney present. While respondent maintains that certain inaccurate statements were made by petitioner during such occasions and during the trial of the instant case, we can only respond to respondent's claim that we thought petitioner was a forthright and credible witness.We do not think that petitioner attempted to mislead us and, after carefully reviewing the record herein, we are not convinced that petitioner intentionally misled the IRS. Finally, respondent alleges that *508 petitioner's and his wife's prior history of paying additions to tax for late filing and negligence is an indicium of fraud. Respondent did introduce into evidence a Transcript of Account [21] with respect to petitioner's and his wife's 1965 through 1968 taxable years.The Transcript of Account reveals that petitioners paid late filing and negligence additions to tax during those years. Respondent introduced no evidence, however, as to the reasons that the negligence additions were assessed. We point out to respondent the following statement in Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941): Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute. The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either. On this record, we are unable to conclude that petitioner had any fraudulent intent for 1969 based on the fact that petitioners were assessed additions to tax for late filing *509 and negligence for some prior years. [22]
In conclusion, we are unable to find clear and convincing evidence of fraud. To reflect concessions by respondent and our holding herein, Decision will be entered for the petitioners.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Petitioner left high school prior to completing his senior year.↩
3. Initially, MFC's organizers held the following positions in the company: President (M. Amico), Vice-President (A. Amico), Secretary (petitioner), and Treasurer (DiMarco).↩
4. While MFC mainly organized junkets to Las Vegas, the record indicates that the company also organized some trips to other places, including Puerto Rico.↩
5. The record indicates that occasionally in individual was permitted to go on one of MFC's junkets without putting up any front money. In addition, the record reveals that some of the front money was collected by Rice, MFC's secretary, and certain travel agents.↩
6. We use the word "allegedly" because neither party has requested us to find that an actual burglary occurred, and the record is inconclusive on this point. We do note that Gingello reported to the sheriff that a burglary occurred and that an investigator from the Monroe County Sheriff's Department visited Gingello's house on the night of the alleged burglary. The investigator found Gingello's house to be in a disheveled condition. The window in the rear door of the house was broken from the outside in, pictures had been taken off the wall, clothing had been tossed on the floor, and footprints coming up to the back of the house were imprinted on snow which had fallen. In addition, the suitcase which Gingello claimed had been packed with marker money, was found near his house on the street; it appeared to the investigator that the suitcase was thrown out of a car.↩
7. The record indicates that an actual list of names and amounts collected had been in Gingello's suitcase and taken along with the money therein.↩
8. The record indicates that the Flamingo Hotel did not suffer any losses as a result of the alleged theft of marker money from Gingello's home.↩
9. The record indicates that Gingello may have been associated with, or had contacts with, organized crime.The parties have stipulated that Gingello was murdered in a "gangland killing" on April 23, 1978. On January 30, 1980, seven of the eight people indicted for his murder were convicted. The other defendant was still awaiting trial at the time the instant case was heard. Petitioner was neither indicted nor in any way implicated in Gingello's murder.↩
10. The Marine Midland loan was given to petitioner several months subsequent to petitioner's purchase of the International Leisure Company stock.↩
11. Of the $8,037.87 in gross income, Forms W-2 attached to petitioners' 1969 joint return show that petitioner had wage income from MFC in the amount of $5,250, and his wife had wage income from Associated Dry Goods Corp. in the amount of $2,366.05. The Federal income tax withheld on petitioners' wages totalled $873.44.↩
12. The record indicates that Endler believed that petitioner caused some of MFC's customers to mail him checks for their outstanding markers even though petitioner did not intend to forward any such checks to the International Hotel, but instead intended to fraudulently convert the proceeds for his own use.↩
13. United States v. Canzano,↩ Criminal Docket No. 1974-235.
14. Respondent also made certain other determinations in the notice of deficiency which, because of concessions that he made, are no longer in issue.↩
15. The phrase "personally pocketed" appears in respondent's reply brief. Respondent does not maintain, nor does the record indicate, that petitioner used those words.↩
16. After respondent had gone forward with his case and called all of his witnesses, petitioner moved that we find for petitioner on the ground that respondent failed to establish fraud by clear and convincing evidence. We denied petitioner's motion at such time because, looking at respondent's evidence in its best light, we concluded that it could possibly support a finding that petitioner appropriated marker money for his personal benefit. After petitioner had gone forward with his case, however, we became convinced that respondent's evidence had been adequately rebutted to the point that it was not "clear and convincing."↩
17. While petitioner also stated that $23,500 of such amount was used for the operation of MFC's Rochester office, the record indicates that petitioner believed that Oakes was aware of this use and approved it. The record is unclear as to whether MFC was obligated to repay the $23,500 to the International and, if so, when. In this connection, we note that the International has never claimed that petitioner, either in his individual capacity or as president of MFC, misappropriated any funds which belonged to it.↩
18. We wish to note that we do not think that petitioner's refusal to offer testimony against Gingello should be viewed as an indicium of fraudulent activity which would be relevant to the instant case. While a taxpayer's refusal to cooperate with the IRS with respect to him own tax liability has been found to be a factor in finding fraud, see Marinzulich v. Commissioner,31 T.C. 487, 492↩ (1958), such rationale should not automatically be extended to encompass a taxpayer's refusal to testify for the government against another individual. This should be particularly true in a case such as the instant one where petitioner's failure to testify against Gingello could have been for a variety of reasons which would not indicate any fraudulent activity on petitioner's part.For example, petitioner may not have testified against Gingello because he may have believed, as Endler himself acknowledged, that if he so testified his life could be in jeopardy. Certainly the record reveals that tension was developing between petitioner and Gingello during the last few months of 1969, and that the reason why petitioner succumbed to Gingello's request for a year-end bonus was because he felt that his life would be in danger if he refused such request. Alternatively, it is possible that petitioner did not testify against Gingello because he did not believe that he had any information which would be helpful to the government.
19. In this connection we note that petitioner was in the used car business during 1969, and it is entirely likely, as was brought out during petitioner's cross-examination of the IRS agent, that the automobiles which petitioner was seen driving during 1969 were cars for such business. ↩
20. In his reply brief, respondent infers that petitioner's purchase of his second home for $40,000 cash also demonstrates that he concealed income. We disagree. While petitioner certainly did acquire a second home during 1969, the bulk of the $40,000 purchase price came from the proceeds received on the sale of his first home (approximately $16,000), the sale of some of his possessions ($3,000), and a $12,000 loan from his father. The approximately $9,000 remaining may very well have come from savings which petitioner had from prior years. In any event, there is not clear and convincing evidence in the record that this $9,000 represents concealed income.↩
21. A Transcript of Account is an IRS record on a particular taxpayer which reveals certain data, including, whether the taxpayer filed a return for a given year, and if so, on what date. ↩
22. While the record certainly does not indicate that petitioners' prior history of late filing was done with an intent to evade tax, we note that even in cases where taxpayers have willfully failed to file Federal income tax returns, such willful failure does not necessarily establish that the taxpayer possessed a specific intent to evade a tax believed or known to be owing. Cirillo v. Commissioner,314 F. 2d 478, 482 (3d Cir. 1963), affd. in part and revg. in part a Memorandum Opinion of this Court; Jones v. Commissioner,259 F. 2d 300, 302 (5th Cir. 1958), revg. and remanding 25 T.C. 1100 (1956); Connor v. Commissioner,T.C. Memo. 1977-121↩.